IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CALVENN N. WOGOU, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV291 |
| | ) | |
| V. | ) | |
| | ) | |
| OMAHA PUBLIC POWER DISTRICT, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |

Plaintiff has brought claims against his former employer, Omaha Public Power District ("OPPD"), alleging race discrimination under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1101, *et seq.* ("NFEPA"). Additionally, Plaintiff has asserted claims for disability discrimination under the Americans with Disabilities Act ("ADA") and retaliatory discharge under § 1981, Title VII and the NFEPA. Defendant has filed a Motion for Summary Judgment (filing 31). For the reasons set forth below, Defendant's Motion will be granted.

STATEMENT OF FACTS[1]

Plaintiff began working for Defendant on June 5, 2006. In January, 2008, Plaintiff was awarded a promotion to the position of Operations System Specialist. When he applied for the position, Plaintiff's resume stated that he would complete his Bachelor of Science in MIS Management in 2008. However, as of the date of his deposition in this case, Plaintiff had still not obtained his degree.

---

[1] The facts were taken from the parties' briefing on this motion for summary judgment and the exhibits submitted therewith. (Def.'s Br. Supp. M. Summ. Judgment, filing 32; Pl.'s Br. Opp'n M. Summ. Judgment, filing 37; Def.'s Index of Evidence, filing 33; Pl.'s Index of Evidence, filing 38.)

Michael Fitzpatrick ("Fitzpatrick") was responsible for assigning tasks and supervising Plaintiff during Plaintiff's employment as an Operation System Specialist. As part of his on-the-job training for his new position, Plaintiff was tutored by Jim McLochlin ("McLochlin"), another OPPD employee. Because McLochlin's work schedule was 7:00 a.m. to 3:30 p.m., Plaintiff was informed at the time he began his new position that he needed to work from 8:00 a.m. to 4:30 p.m. to accommodate McLochlin. Prior to his promotion, Plaintiff's work hours were 9:00 a.m. to 5:30 p.m..

Within his first month as an Operations System Specialist, Plaintiff called in sick several times. On March 3, 2008, Plaintiff did not come to work and did not contact anyone in management until around 1:00 p.m. that day. In March, 2008, Fitzpatrick reminded Plaintiff of the OPPD attendance policy and stated it was necessary for Plaintiff to be at work on time so that he could work closely with McLochlin. After this meeting with Fitzpatrick, Plaintiff's attendance did not improve. Although Plaintiff was aware that he was expected to arrive at work by 8:00 a.m., Plaintiff consistently arrived late. Plaintiff testified in his deposition that he typically woke-up around 7:30 a.m. to start his day.

On or about March 5, 2008, Plaintiff first mentioned to Fitzpatrick that he had problems affecting his sleep and requested a modified work schedule to come into work later. Defendant requested a note from Plaintiff's doctor substantiating the medical necessity of a schedule change. Plaintiff provided a note dated March 14, 2008 from his doctor, Dr. Jeffrey Passer ("Dr. Passer"). The note stated that Plaintiff had a medical issue affecting his sleep and that Plaintiff and Dr. Passer were trying to correct the problem. The note did not state that Plaintiff needed an alternate work schedule. Plaintiff never provided Defendant with medical documentation specifically stating that he required a modified work schedule. Plaintiff alleges that he complained about being required to provide medical documentation to support his request for a modified schedule. At some point, Fitzpatrick informed Plaintiff that he could work his requested hours of 9:00 a.m. to 5:00 p.m. after he finished his training.

Plaintiff claims to suffer from frequent nocturia with insomnia. Nocturia causes frequent urination, mainly at nighttime. Plaintiff testified in his deposition that his nocturia generally woke him up around four to five times per night and that, on average, he would get

2

approximately four to five hours of sleep. Plaintiff estimated that, at its worst, he was awake all night about once a week. Plaintiff was able to get an additional hour of sleep when he was taking sleep medications. He was also able to get an additional hour of sleep by going to bed an hour or so earlier at night. Plaintiff testified that he typically went to bed around 11:00 p.m., but that he started to go to bed an hour or so earlier beginning in March or April, 2008. Plaintiff further testified that stress and other issues unrelated to his condition caused him to lose sleep. Plaintiff stated that in September, 2008, he was unsure whether his nighttime urination was caused by nocturia or by drinking too much water at night. Plaintiff claims that his sleeping problems began while he was employed with Defendant. However, prior to his employment with Defendant, and before the alleged condition began, Plaintiff occasionally had problems arriving to work on time.

Plaintiff received a written warning from Defendant on April 2, 2008. The warning informed Plaintiff that his attendance and punctuality were unacceptable and that failure to improve his performance level would result in additional disciplinary action, including termination. On April 8, 2008, Fitzpatrick discussed attendance issues, as well as Plaintiff's habit of taking extended lunch breaks of up to an hour and a half, with Plaintiff. Despite these admonitions, Plaintiff was tardy or absent on multiple occasions through April, June, July, August and September, 2008. Fitzpatrick spoke with Plaintiff about his tardiness and absences throughout the Summer of 2008.

On April 7, 2008, Dr. Passer wrote a progress note, stating that Plaintiff was "doing better with his sleep but still wakes up once a night and goes to the bathroom . . . There is no reason that he cannot get to work on time." (Filing 33-3 at CM/ECF p. 9.) On April 8, 2008, Dr. Passer wrote a follow-up letter to his March 14, 2008 note. The letter stated that Plaintiff "should still be able to get up on time and go to work. If necessary he should go to sleep earlier in the evening." (Filing 33-3 at CM/ECF p. 11.) Plaintiff did not provide a copy of Dr. Passer's April 8, 2008 letter to Defendant.

On October 2, 2008, Plaintiff received a performance review. Plaintiff received the lowest possible score in his overall rating. That day, Defendant implemented a Performance Improvement Plan ("PIP") for Plaintiff due to his continued poor attendance, tardiness and

3

performance problems. At the time that the PIP was established, Plaintiff was informed that he needed to improve in attendance, as well as quality, quantity and capability with respect to his overall performance. After receiving his performance review and PIP, Plaintiff understood that his job was in jeopardy. Plaintiff's PIP progress was discussed with him on multiple occasions in October, November and December, 2008.

Fitzpatrick recommended that Plaintiff be terminated on November 25, 2008. However, Fitzpatrick decided to postpone terminating Plaintiff until after the holiday season and after the PIP expired.

Plaintiff sent Rubin Carter ("Carter"), Division Manager for Corporate Diversity and Advocacy, an email regarding his concerns with his performance review on December 14, 2008. Plaintiff did not state in the email that he was treated differently because of his race or alleged disability. Because Carter was transitioning toward retirement, Carter passed Plaintiff's information on to Sherrye Hutcherson ("Hutcherson") and asked that she handle the matter. Neither Carter nor Plaintiff indicated to Hutcherson that Plaintiff's concerns included allegations that he had been treated differently because of his race or alleged disability. During Plaintiff's March 3, 2009, interview with the Nebraska Equal Opportunity Commission, Plaintiff admitted that he did not complain to Defendant about discrimination.

Defendant's Human Resources Department postponed Plaintiff's termination to investigate Plaintiff's concerns about his workplace relationships and the legitimacy of the termination decision. After Human Resources concluded that the termination decision was legitimate, Plaintiff was terminated effective February 20, 2009.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## ANALYSIS

**1.     ADA Disability Discrimination Claim**

To establish a prima facie case under the ADA, Plaintiff must show that he (1) is a disabled person within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) has suffered an adverse employment action as a result of his disability. *Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998). If Plaintiff makes this showing, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 872-73. If Defendant is able to demonstrate a nondiscriminatory reason for its actions, the burden shifts back to Plaintiff to prove that Defendant's stated reason is a pretext for discrimination. *Id.*

After reviewing the matter, the court concludes that Plaintiff cannot establish a prima facie case because he is not disabled within the meaning of the ADA. Under the ADA, a person is disabled if he or she is limited in a major life activity. 42 U.S.C. § 12102. In order for an individual to demonstrate that he or she is limited in the major life activity of sleeping, he or she must present evidence showing that the severity of the sleep disruptions or insomnia substantially limits his sleep as compared to the general population. *See Nuzum v. Ozark Automotive Distributors, Inc.*, 432 F.3d 839, 848 (8th Cir. 2005). Plaintiff has not made this showing.

Other than his own, conclusory affidavit, Plaintiff has not offered any evidence to

suggest that the severity of his sleeping problems substantially limits his sleep as compared to the general population. Plaintiff testified that during his employment with Defendant, his nocturia generally woke him up around four to five times at night and that, on average, he got approximately four to five hours of sleep. Plaintiff estimated that, at its worst, he was awake all night about once a week. Plaintiff stated, however, that he was able to get an additional hour of sleep when he went to bed earlier or when he took a sleeping aid. *See Nuzum*, 432 F.3d at 848 (8th Cir. 2005) (finding that the plaintiff was not substantially limited in the major life activity of sleeping where he was limited to four to five hours of sleep per night); *Boerst v. Gen. Mills Operations, Inc.*, 25 Fed. Appx. 403, 407 (6th Cir. 2002) (finding that getting between two and four hours of sleep at night does not qualify as a substantial limitation on the major activity of sleeping). Although Plaintiff's sleeping problems were surely inconvenient, the evidence offered does not support the conclusion that Plaintiff was substantially limited in the major life activity of sleeping.

Also, Plaintiff cannot demonstrate that his sleep deprivation was caused by his nocturia. Plaintiff testified that he lost sleep at least partly due to stresses that were unrelated to his nocturia. Plaintiff admitted that, in September, 2008, he was unable to tell whether his nighttime urination was caused by nocturia or by the fact that he was drinking water later in the evening. Even before he began working for Defendant, and before his nocturia developed, Plaintiff occasionally had difficulty getting to work on time. Plaintiff cannot show that his nocturia was the cause of his sleep loss, and resultant tardiness to work, rather than his failure to take measures which would allow for adequate sleep. Tellingly, Plaintiff's own doctor determined that there was no reason that Plaintiff could not get to work on time.

In any event, even if Plaintiff could establish a prima facie case under the ADA, Plaintiff's claim would nevertheless fail because Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Within the first month at his new position, Plaintiff had several absences. In March, 2008, Fitzpatrick reminded Plaintiff of the OPPD attendance policy and stated in was necessary for Plaintiff to be at work on time. However, Plaintiff's attendance issues and punctuality did not improve. In April, 2008, Plaintiff received a written warning informing him that his attendance and punctuality were unacceptable and that failure to improve his performance level could result in termination.

6

Following Plaintiff's receipt of the written warning, Fitzpatrick discussed attendance issues, as well as Plaintiff's habit of taking extended lunch breaks, with Plaintiff. Despite this written warning and subsequent conversations with Fitzpatrick regarding attendance issues, Plaintiff was tardy or absent on multiple occasions through April, June, July, August and September of 2008.

Plaintiff received the lowest overall rating on his October 2, 2008 performance review. The review stated, in part, that Plaintiff needed to "improve in his accuracy and thoroughness," "pay attention to the details," and "improve on following up on his assigned tasks." (Filing 38-1.) Based on his work performance and attendance record, Defendant implemented a PIP for Plaintiff. At the time he received the PIP, Plaintiff was informed that he needed to improve the quantity and quality of his work performance. When he received the PIP, Plaintiff understood that his job was in jeopardy.

Moreover, Plaintiff cannot show that Defendant's reason for terminating his employment was a pretext for discrimination. A reason cannot be proved to be a pretext for discrimination unless it is shown that the reason was false and that discrimination was the actual reason for the adverse employment action. *Floyd v. State of Missouri Dept. of Social Services*, 188 F.3d 932, 937 (8th Cir. 1999) (quotation and citation omitted). Aside from his own self-serving affidavit and the subjective conclusions contained therein, Plaintiff has presented no evidence indicating that Defendant's reason for terminating him was pretextual. In fact, Plaintiff admits that neither Fitzpatrick, nor McLochlin made negative comments about individuals with disabilities or Plaintiff's medical condition. Defendant is entitled to summary judgment on Plaintiff's claim for disability discrimination.

2.  **Race Discrimination Claim Under § 1981, Title VII and the NFEPA**

In the absence of direct evidence of race discrimination, courts evaluate Title VII, § 1981 and NEFPA claims under the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792

7

(1973) framework.[2] *Holmes v. Archer Daniels Midland Co.*, 724 F.Supp.2d 1050 (D. Neb. 2010). Under *McDonnell Douglas*, the plaintiff has the burden of providing a prima facie case of discrimination, and once the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its termination of the employee. *Id.* If the employer carries the burden, the employee must then prove that the legitimate reason offered by the employer was a pretext for discrimination. *Id.*

In order to establish a prima facie cause of action for race or color discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). Plaintiff, an African American, is a member of a protected class and has suffered an adverse employment action, *i.e.*, termination. However, the evidence shows that Plaintiff did not meet Defendant's legitimate expectations. As detailed previously, Plaintiff's employment was plagued with absences and tardiness and he received the lowest possible score on his performance review. Defendant gave Plaintiff several opportunities to improve his performance, but Plaintiff failed to do so. Plaintiff cannot establish a prima facie case of discrimination.

Moreover, Plaintiff has offered no evidence showing that Defendant's reason for terminating him was pretextual. Plaintiff's subjective beliefs that he was discriminated against because of his race are insufficient to show pretext. *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989) (noting that a plaintiff's subjective beliefs that the employer harbors racial bias are insufficient to create a genuine issue of material fact). Plaintiff alleges, without any evidentiary support, that McLochlin made racist comments about minorities in an effort to intimidate him. McLochlin admits that he made a comment to Plaintiff about McLochlin's personal disagreement with affirmative action. However, McLochlin was not

---

[2] Section 1981 claims are analyzed under the same standards as Title VII claims. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005). Claims brought under the NFEPA are likewise analyzed under these standards. *Father Flanagan's Boys Home v. Agnew*, 256 Neb. 394, 401-02, 590 N.W.2d 688, 693 (1999). Therefore, the claims will not be addressed separately in this order.

Plaintiff's supervisor and did not have authority to fire or discipline Plaintiff. McLochlin's comments do not show discrimination. *See Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 924 (7th Cir. 1998) (holding that a co-worker's racially biased comments are insufficient evidence of the decision maker's intent). Plaintiff admits that his supervisor, Fitzpatrick, never made any racially-charged statements. Based on the evidence presented, Defendant is entitled to summary judgment on Plaintiff's race and color discrimination claims.

3.      **Retaliation Claims Under Title VII, § 1981 and the ADA**

In order to survive summary judgment on a Title VII, § 1981 or ADA retaliation claim,[3] Plaintiff must demonstrate that (1) he engaged in protected conduct; (2) there was an adverse employment action; and (3) the adverse employment action was causally linked to the protected conduct. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059-60 (8th Cir. 1997). If a prima facie case is established, the *McDonnell Douglas* burden-shifting framework is applied. *Id*.

Plaintiff alleges that his complaints in May of 2008, regarding Defendant's need for information about his medical condition constituted a protected activity. However, because Plaintiff's alleged condition was not open and obvious, it was permissible for Defendant to request medical documentation of Plaintiff's limitations to support his request for a modified work schedule. *See Bergeron v. Nw. Publications, Inc.*, Case No. CIV 3-94-1124, 1996 WL 210789, *6 (D. Minn. Jan. 12, 1996) (quotation and citation omitted). Plaintiff's opposition to Defendant's legitimate request for medical records is not a protected activity. *See Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007) ("Thomas did not engage in statutorily protected conduct by opposing Dr. Harris's legitimate, focused request for Thomas's medical records, a request both job-related and consistent with a business necessity."). Plaintiff's objection to Defendant's request for medical documentation cannot serve as the basis for

---

[3] Section 1981 and ADA retaliation claims are analyzed under the same standards as Title VII claims. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059-60 (8th Cir. 1997); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999). Therefore, the claims will not be discussed separately in this order.

9

Plaintiff's retaliation claim.

Plaintiff also claims that his complaints to Rubin Carter regarding his work relationship with McLochlin and Fitzpatrick constitute protected activity. However, mere complaints about workplace civility are not protected activities. *See Smith v. Int'l Paper Co., 523 F.3d 845, 850 (8th Cir. 2008)* (finding that complaints about supervisor's yelling, cussing and hollering did not constitute protected conduct). Instead, the employee must attribute the employer's conduct to discrimination. *Hunt v. Nebraska Public Power Dist., 282 F.3d 1021, 1028-29 (8th Cir. 2002)*. In this case, Plaintiff's December 14, 2008 email to Carter does not contain allegations that Plaintiff was subject to race or disability discrimination. Moreover, Plaintiff admits that, during his interviews with the Nebraska Equal Opportunity Commission, he did not complain to Defendant about discrimination or indicate that he believed that Defendant's conduct was the result of his race or medical condition. Because the evidence presented does not show that Plaintiff ever attributed Defendant's conduct to discrimination, his communications with Carter do not constitute protected activity.

Also, Plaintiff has pointed to no evidence indicating that his termination was the result of his alleged complaints. Plaintiff's email to Carter occurred in December, 2008. However, the decision to terminate Plaintiff's employment was made in November, 2008. As recognized by Plaintiff, Fitzpatrick delayed terminating Plaintiff until after the holiday season. Plaintiff cannot establish a causal connection between his complaints to Carter and his termination.

Finally, even assuming Plaintiff could establish a prima facie case, as explained above, Defendant has articulated a legitimate reason for terminating Plaintiff and Plaintiff has not shown pretext. Accordingly, Plaintiff's retaliation claims will be dismissed.

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (filing 31) is granted.

2. Judgment will be entered by separate document.

**DATED May 14, 2012.**

**BY THE COURT:**

**S/ F.A. Gossett**
**United States Magistrate Judge**